UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DOUGLAS A. HARRIS, JR.,<br><br>     Plaintiff,<br> v.<br><br>NANCY A. BERRYHILL, Deputy<br>Commissioner of Social Security for<br>Operations,<br><br>     Defendant. | CASE NO. C17-1506 BHS<br><br>ORDER REVERSING AND<br>REMANDING FOR FURTHER<br>PROCEEDINGS |

## I.  BASIC DATA

Type of Benefits Sought:

 ( X ) Disability Insurance

 ( X ) Supplemental Security Income

Plaintiff's:

 Sex:  Male

 Age:  36 at the time of alleged disability onset

Principal Disabilities Alleged by Plaintiff:  Bipolar II disorder; obsessive compulsive disorder; racing thoughts; obsessive thoughts; anger; bad veins in legs removed in 2006; allergy to sunlight.  AR at 107.

Disability Allegedly Began:  May 31, 2010[1]

Principal Previous Work Experience:  heating and air conditioning service technician; building maintenance worker; warehouse worker; delivery route driver.

Education Level Achieved by Plaintiff:  High school diploma.

## II.    PROCEDURAL HISTORY—ADMINISTRATIVE

Before Administrative Law Judge ("ALJ")[2]:

Date of Hearing:  November 7, 2016

Date of Decision:  February 24, 2017

Appears in Record at:  AR 10-37

Summary of Decision:

The claimant has not engaged in substantial gainful activity since June 3, 2011 (20 C.F.R. §§ 404.1571, et seq., and 416.971, et seq.);

The claimant has the following severe impairments: right knee medial meniscus tear, status post arthroscopic repair; mild chronic neurogenic motor unit changes of the bilateral upper extremities; right rotator cuff tendinopathy; likely asthma versus perennial/seasonal allergic rhinitis; obesity (ending in 2016); major depressive disorder, recurrent, moderate; bipolar disorder; anxiety disorder; personality disorder NOS (antisocial and/or borderline); attention deficit hyperactivity disorder (ADHD); and posttraumatic stress disorder (PTSD) (20 C.F.R. §§ 404.1520(c) and 416.920(c));

The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed

---

[1] Plaintiff was previously denied disability benefits in a September 21, 2011 initial level determination.  AR at 112, 118.  Plaintiff did not seek reconsideration of that decision, and therefore the relevant period here does not begin until September 22, 2011.

[2] The ALJ held a hearing on December 20, 2013 and issued his original decision on July 1, 2014.  AR at 43-75, 183-206.  The Appeals Council remanded the matter back to the ALJ on June 3, 2016.  *Id.* at 207-10.  The information here refers to the hearing and ALJ's decision following remand.

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926);

After careful consideration of the entire record, the ALJ found that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c). He can occasionally climb. He can frequently balance, stoop, kneel, crouch, and crawl. He can occasionally reach overhead. He can have occasional exposure to vibration, vibrating tools, machines, and vehicles. He can have occasional exposure to pulmonary irritants such as dust, fumes, odors, gases, pollens, airborne pollutants, and poor ventilation. He can have occasional exposure to hazardous conditions such as proximity to unprotected heights and moving machinery. He can adapt to a predictable work routine in terms of assigned tasks and the procedures for accomplishing those tasks. He can understand, carry out, and remember instructions. He can use average judgment in making work-related decisions. He is limited to occasional and superficial interaction with the public and with coworkers.

The claimant is capable of performing past relevant work as a building maintenance worker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965);

Born on XXXX, 1973,[3] the claimant is a younger individual age 18-49 (20 C.F.R. §§ 404.1563 and 416.963);

The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964);

Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not he has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2);

Considering the claimant's age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant also can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a));

---

[3] Dates of birth are redacted to the year. *See* Fed. R. Civ. P. 5.2(a)(2); LCR 5.2(a)(1).

The claimant has not been under a disability, as defined in the Social Security Act, from September 22, 2011 through the date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

Before Appeals Council:

Date of Decision: August 4, 2017

Appears in Record at:  AR 1-6

Summary of Decision:  Denied review.

### III.    PROCEDURAL HISTORY—THIS COURT

Jurisdiction based upon: 42 U.S.C. § 405(g)

Brief on Merits Submitted by ( X ) Plaintiff   ( X ) Commissioner

### IV.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the Court may set aside Defendant Nancy Berryhill's (the "Commissioner") denial of Social Security benefits when the ALJ's findings are based on legal error or not supported by substantial evidence in the record as a whole. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "Substantial evidence" is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving any other ambiguities that might exist. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  While the Court is required to examine the record as a whole, it may neither reweigh the evidence nor substitute its judgment for that of the ALJ.  *See Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir.

2002). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Id.*

## V.    EVALUATING DISABILITY

The claimant, Douglas Harris, Jr. ("Harris"), bears the burden of proving he is disabled within the meaning of the Social Security Act ("Act"). *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). The Act defines disability as the "inability to engage in any substantial gainful activity" due to a physical or mental impairment which has lasted, or is expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A). A claimant is disabled under the Act only if his impairments are of such severity that he is unable to do his previous work, and cannot, considering his age, education, and work experience, engage in any other substantial gainful activity existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A); *see also* *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999).

The Commissioner has established a five-step sequential evaluation process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proof during steps one through four. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009). At step five, the burden shifts to the Commissioner. *Id.*

# VI. ISSUES ON APPEAL

Whether the ALJ properly evaluated Harris's mental symptom testimony;

Whether the ALJ properly evaluated the opinions of Paul Connor, Ph.D.;

Whether the ALJ properly evaluated the opinions of Danielle Jenkins, Psy.D.;

Whether the ALJ properly evaluated the opinions of Wayne Dees, Psy.D.;

Whether the ALJ properly evaluated the opinions of Andrew Forsyth, Ph.D. and Steven Haney, M.D.

Whether, if the ALJ committed reversible error, the matter should be remanded for an award of benefits.

# VII. DISCUSSION

## A. The ALJ Erred in Evaluating Harris's Mental Symptom Testimony

The ALJ found that Harris's statements concerning the intensity, persistence, and limiting effects of his mental[4] symptoms were "not entirely consistent with the evidence." AR at 20. The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited." *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). The ALJ must first determine whether the claimant has presented objective medical evidence of an impairment that "'could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014)). At this stage, the claimant need only

---

[4] The ALJ also found that Harris's statements regarding his physical symptoms were not entirely consistent with the evidence, but Harris does not challenge this finding. *See* Op. Br. (Dkt. # 16) at 12-18. The Court will therefore not address this aspect of the ALJ's decision.

show that the impairment could reasonably have caused some degree of the symptom; he does not have to show that the impairment could reasonably be expected to cause the severity of the symptom alleged. *Id.* The ALJ found that Harris met this step because his medically determinable impairments could reasonably be expected to cause the symptoms he alleged. AR at 20.

If the claimant satisfies the first step, and there is no evidence of malingering, the ALJ may only reject the claimant's testimony "'by offering specific, clear and convincing reasons for doing so. This is not an easy requirement to meet.'" *Trevizo*, 871 F.3d at 678 (quoting *Garrison*, 759 F.3d at 1014-15).

As an initial matter, The Commissioner contends that the ALJ found evidence of malingering, and was therefore entitled to discredit Harris's testimony. *See* Response, Dkt. # 16 at 3. The ALJ noted that examining psychologist Victoria McDuffee, Ph.D. suggested Harris "put forth less than full effort" on the Test of Memory and Malingering ("TOMM"). AR at 21, 546. However, The Commissioner's own policies reject the use of the TOMM, stating that "[t]ests cannot prove whether a claimant is malingering because there is no test that, when passed or failed, conclusively determines the claimant's motivation. Malingering requires a deliberate attempt to deceive." Soc. Sec. Admin., Program Operations. Manual Sys. ("POMS"), DI 22510.006(D), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0422510006. The Court will not accept as evidence of malingering a test that the Commissioner has already found is insufficient to do so. The ALJ was therefore required to provide clear and convincing reasons for rejecting Harris's testimony. *See Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007).

The ALJ gave four reasons for rejecting Harris's testimony: (1) it was inconsistent with Harris's medical records, testing, and history; (2) it was inconsistent with Harris's daily activities; (3) the evidence showed a situational component to Harris's claims; and (4) Harris misreported his use of alcohol. AR at 20-23.

### 1. Inconsistency with Medical Evidence

The ALJ discounted Harris's testimony because he found it inconsistent with the medical evidence in the record. *Id.* at 21-22. The ALJ determined that Harris's anxiety and mood were largely stable between May 2010 and June 2011. *Id.* at 21. The ALJ further noted that Harris's mental status was "largely unremarkable" when he was evaluated by Victoria McDuffee, Ph.D. in January 2012. *Id.* Harris reported anger issues "but acknowledged that he could refrain from acting on his anger." *Id.* at 22.

The ALJ's position is not a reasonable interpretation of the evidence. In analyzing the medical evidence, the ALJ "cannot simply pick out a few isolated instances" of medical health that support his conclusion, but must consider those instances in the broader context "with an understanding of the patient's overall well-being and the nature of [his] symptoms." *Attmore v. Colvin*, 827 F.3d 872, 877 (9th Cir. 2016). Here, the ALJ acknowledged medical evidence of Harris's mental health issues, such as anxiety and anger, but downplayed them because Harris was cooperative with his providers at times and did not have any obvious crises due to his anger issues. *Id.* at 21-22. The record is replete with evidence of ongoing psychological issues, however. Harris's providers regularly noted that he was anxious, depressed, and had a blunted affect. *See, e.g.*, *id.* at 512, 515, 522, 525-26, 567, 573, 611, 620, 692, 707, 785, 1167, 1173. Moreover, Harris

regularly told providers he had thoughts of suicide, but had not acted on them because he did not feel suicide was morally right. *See, e.g.*, *id.* at 744, 1173.

Regarding Harris's anger issues, the ALJ indicated that Harris's testimony should be discounted because he has not acted on his anger. This is not accurate, nor is it a reasonable position. Certainly one does not have to physically harm someone to have recognizable anger issues. Harris told one provider he hears voices telling him to "initiate fights and kill people" on a daily basis. AR at 512. That provider found Harris's complaints serious enough that Harris was placed on a mental health hold and evaluated by police to determine if he was at risk of endangering others before he was allowed to leave the provider's office. *Id.* In April 2013, another provider noted that Harris reported moving from Colorado to Washington because he was concerned he would seek revenge against individuals he perceived as having wronged him, and had "imagine[d] slitting the throats or burning down the houses of those who, he feels, have betrayed [sic] in the past." *Id.* at 913.

Moreover, the record shows Harris did not always restrain himself. He reported getting in three fights in a month in 2011, all of which ended with his opponent in the hospital. *Id.* at 512. Harris sprained his hand punching a hole in a cabinet door after his girlfriend broke up with him. *Id.* at 629. He injured his hand punching boxes on the floor after a confrontation with a trespasser in his building. *Id.* at 744.

The ALJ's determination that Harris's symptom testimony was inconsistent with the medical evidence is thus not supported by substantial evidence in the record, and the ALJ erred in discounting Harris's testimony on this basis.

## 2.    Inconsistency with Daily Activities

The ALJ stated that Harris's daily activities were inconsistent with his alleged physical and mental symptoms.  An ALJ may consider a claimant's daily activities in assessing his or her testimony.  But daily activities that do not contradict a claimant's testimony or meet the threshold for transferrable work skills cannot form the basis of an adverse credibility determination.  *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

The ALJ's determination of inconsistency rests on weak grounds.  The ALJ claimed Harris was inconsistent because he reported at one point that he did not drive because he was too nervous, but told examiner Wayne Dees, Psy.D. that he could drive despite not having a license.  *See* AR at 23.  In fact, Harris wrote in an adult function report that he did not drive because he had no license and was too nervous.  *Id.* at 423.  Dr. Dees noted only that Harris was [a]ble to drive, but has no license." *Id.* at 551.  This hardly seems a significant inconsistency, if one exists at all.

The ALJ also faulted Harris because he testified that his parents do his grocery shopping, but Dr. Dees reported that Harris shopped for food with an EBT card.  *Id.* at 23.  Harris actually testified that he would go into the store and pick out what he needs, but wait in the car while his parents waited in line and checked out.  *Id.* at 90.  Dr. Dees did not contradict this; he merely noted that Harris "[s]hops for food with EBT card." *Id.* at 551.  Again, this is not a significant inconsistency that would justify discrediting Harris's symptom testimony.

The record reveals slightly more inconsistency regarding Harris's physical exertional activities, but still not enough, standing alone, to justify rejecting Harris's

testimony. Harris testified in December 2013 that he had difficulty climbing stairs because of his knees, and difficulty lifting or bending because of his lower back. *Id.* at 61. In October 2012, however, he told Dr. Dees that he "like[s] to hike and fish with [his] dad." *Id.* at 551. The ALJ also noted that Harris was exercising and attending physical therapy in 2015 and 2016. *Id.* at 767, 1106, 1362. These statements could possibly be interpreted as inconsistent, but, given the ALJ's multiple other errors in evaluating Harris's testimony, do not alone justify the ALJ's rejection of Harris's testimony. *See also infra* Part VII.A.5.

Finally, the ALJ claimed Harris's testimony that he had difficulty leaving his home was inconsistent because "there is no indication that he had any significant trouble maintaining his schedule, attending his appointments, or getting around as necessary. AR at 23. But the ALJ does not cite to anything in the record to support his position. Moreover, the ALJ's position would put Harris in an impossible situation with respect to his medical appointments: either Harris attended those appointments and "contradicted" his testimony that he had difficulty leaving his home, or he did not attend those appointments, thereby failing to comply with treatment. *Cf. Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (holding that "an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment" can constitute a sufficient reason for discrediting a claimant's symptom testimony). The Court will not fault Harris for trying to comply with his treatment, and the ALJ should not have done so, either. The ALJ's rejection of Harris's testimony as inconsistent with his daily activities was thus not supported by substantial evidence in the record.

### 3. Situational Component

The ALJ noted several statements in the record which he concluded showed that Harris had motivations beyond his disability for not working. First, the ALJ noted that Harris told Dr. McDuffee in January 2012 that he had left jobs in the past because he would get "dissatisfied" with them due to "hours, money, or being taken advantage of at the job sites." AR at 22, 543. A claimant's decision to leave work for reasons unrelated to a claimed disability may be a clear and convincing reason to find a claimant's testimony unreliable. *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001). However, Dr. McDuffee indicated that Harris left his prior jobs because of his mental disabilities; Harris exhibited "self-sabotaging behaviors" and paranoid thoughts, and "reported a belief that's [sic] others are taking advantage of him in the work setting, causing him to quit his jobs." *Id.* at 545. Elsewhere in the record, Harris consistently reported that he left his prior jobs due to his anxiety and/or other conditions. *Id.* at 84, 365, 551, 715-16. The ALJ's interpretation of a single vague record was insufficient from which to conclude that Harris was choosing not to work for reasons other than his claimed disabilities.

Second, the ALJ pointed to two statements in the record which he interpreted to mean that Harris was not looking for work because it might hamper his disability benefits claim. *Id.* During a phone checkup in November 2012, a provider noted that Harris "has not been looking for jobs [because] he worries that he will make too much money and lose his benefits and/or will need to take too much time off due to possible upcoming surgeries." *Id.* at 629. In a record from January 2016, Harris's mental health provider

noted that Harris expressed frustration at the effectiveness of his treatment, stating that he "feels as though he has heard this all before, but it simply does not sink in."  AR at 748. In this second record, the provider went on to state that he and Harris "spoke about how [Sound Mental Health] services are necessary because it [sic] helps him build a case for SSI while at the same time ensuring that he has an agency he can depend on in times of crisis."  *Id.*

The ALJ could not reasonably find, based on these two records, that Harris was exaggerating or misreporting his mental health symptoms.  Both statements, relayed secondhand, contain ambiguities as to their meaning.  And the second statement the ALJ referenced does not even appear to have been made by Harris.  *See id.*  While the ALJ is entitled to resolve ambiguities in the evidence, he must provide clear and convincing reasons to reject Harris's testimony, and reference to two ambiguous statements about Harris's efforts to seek alternative work and treatment without explanation does not satisfy this standard.  *See generally Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014) (holding that "one weak reason," even if supported by substantial evidence, "is insufficient to meet the 'specific, clear and convincing' standard" for rejecting a claimant's testimony) (quoting *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012)).

Third, the ALJ noted that Harris "had plans to move to Colorado and live with friends, but he was waiting on his Social Security hearing to happen."  The ALJ failed to explain how this was relevant to the veracity of Harris's symptom testimony.  It did not contradict his claims of anxiety, anger, or other disability.  The ALJ thus erred in rejecting Harris's testimony on the basis of a situational component.

Finally, the ALJ noted, with no further analysis, that Harris "acknowledged that his felony conviction restricted his employment opportunities." *Id.* at 23. The simple fact of a felony conviction is not a clear and convincing reason to reject Harris's symptom testimony. *See Buck v. Astrue*, No. 3:10-cv-05519-KLS, 2011 WL 2600505, at *11 (W.D. Wash. June 28, 2011) (holding that "the mere fact that a claimant has been incarcerated or has a criminal history" is not a clear and convincing reason to reject a claimant's symptom testimony). Nor is the fact that Harris's criminal history may have posed a non-disability-related barrier to employment sufficient, as that does not contradict his claims of disabling symptoms.

###     4.     Misreport of Alcohol Use

The ALJ finally discounted Harris's mental health symptom testimony because he inconsistently reported his alcohol use. AR at 23, 195. At the hearing in November 2016, Harris testified that he had not used alcohol in "a couple years." *Id.* at 89. The ALJ noted that in January and October 2012, Harris reported that he drank "to get drunk" one to two times per month. *Id.* at 544, 567. In November 2012, Harris reported that he was not drinking, but stated only that it was because he was "broke." *Id.* at 629. In April 2013, Harris reported that his last drink was about six months prior, and that the most he had consumed in one day was 12-15 shots of liquor and 10-18 beers. *Id.* at 692. None of this is inconsistent, nor does it indicate why Harris's testimony about his mental health symptoms should be discredited. *Cf. Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) ("It's not sufficient for the ALJ to make only general findings [regarding a claimant's symptom testimony]. . . . If the ALJ wished to reject [the claimant's symptom]

testimony, he was required to point to specific facts in the record which demonstrate that [the claimant's symptoms are less severe] than she claims.")

The only possible inconsistency is the fact that several medical records from 2016 state that Harris was still drinking alcohol at that time, contrary to his hearing testimony. A close reading of the medical record indicates, however, that these records may not be accurate. In December 2012, a record from HealthPoint noted under "Social History" the following: "There is a history of alcohol use. Beer and liquor approximately a variable amount daily, was consumed monthly. Last alcoholic drink was two weeks ago." AR at 617. That language was repeated word-for-word[5] every time alcohol was addressed in the "Social History" section of HealthPoint's records through June 30, 2016. *See id.* at 603, 1386, 1391, 1397, 1406, 1441, 1451, 1454, 1458, 1462, 1471, 1492, 1499, 1502. Given the odd syntax of this language, as well as its inclusion in what is commonly a boilerplate section of medical reports, it is highly doubtful that this record accurately reflects Harris's alcohol consumption. This is further supported by the fact that the appointments from March 3, 2014 and March 13, 2014 both state that Harris's last drink was two weeks prior to each appointment, a temporal impossibility. *See id.* at 1462, 1471.

Regardless, in light of the remainder of the Court's analysis as to the ALJ's rejection of Harris's symptom testimony, the Court will not uphold that determination solely on a possible inconsistency between Harris's hearing testimony that he stopped

---

[5] In April 2016, the first sentence was changed to: "The patient drinks alcohol." *Id.* at 1386, 1391, 1397, 1406. The next two sentences remained the same. *Id.*

consuming alcohol two years prior, and questionable medical records suggesting he may still be drinking.  *See Burrell*, 775 F.3d at 1140.

### 5.     Harmful Error

The ALJ's rejection of Harris's testimony cannot be considered harmless.  The Court cannot consider an error harmless unless it can "confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006).  Here, the Court is unable to say that the ALJ would have reached the same conclusion if he had correctly evaluated Harris's symptom testimony as compared to the medical evidence, his daily activities, the alleged situational component, and Harris's reports of alcohol use.  The ALJ's errors were therefore harmful, and his decision must be reversed.

## B.     The ALJ Erred in Evaluating the Medical Opinions of Paul Connor, Ph.D.

Dr. Connor examined Harris on March 11, 2013.  AR at 714.  He administered 15 different psychological tests, and spent an hour and a half interviewing Harris.  *Id.*  In a thorough report, Dr. Connor opined that Harris performed in the average to high average range for cognitive functioning, including learning and memory.  *Id.* at 718.  Harris showed "fairly substantial troubles with focusing and maintaining attention over long periods of time."  *Id.*  He also demonstrated poor impulse control.  *Id.* at 718-19.  Dr. Connor opined that Harris's testing "supported his report of very significant emotional distress," which "would likely be the greatest barrier to successful employment for him."  *Id.* at 719.  Due to this emotional distress, Dr. Connor opined that Harris "may experience

greater troubles with memory and problem solving" in settings less controlled than the testing environment. *Id.*

The ALJ gave little weight to Dr. Connor's opinions. *Id.* at 25. He determined that Dr. Connor's opinions were (1) inconsistent with Harris's mental health treatment history; and (2) based on Harris's self-reports, which the ALJ had rejected. *Id.* at 26, 197. Regarding Dr. Connor's opinion that Harris may experience greater memory problems outside the controlled testing environment, the ALJ determined that this was contradicted by objective medical testing (both Dr. Connor's testing and that of Dr. McDuffee), and that the opinion was vague. *Id.* at 26, 197.

To reject the opinion of an examining doctor, even if it is contradicted by another doctor, the ALJ must provide "specific and legitimate reasons that are supported by substantial evidence in the record." *See Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1996) (citing *Andrews*, 53 F.3d at 1042). The ALJ can satisfy this requirement "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citing *Magallanes*, 881 F.2d at 751). The court may also draw "specific and legitimate inferences from the ALJ's opinion." *Magallanes*, 881 F.2d at 755.

### 1. Consistency with Medical History

The record does not support the ALJ's rejection of Dr. Connor's opinions as inconsistent with Harris's mental health treatment history. Much like his rejection of Harris's testimony, the ALJ cherry-picked several records to suggest that Harris's anxiety

was stable, he was able to refrain from acting on his anger, and he had no objective

memory problems.  *See* AR at 26.  As discussed above, the medical record does not

support these conclusions.  *See supra* Part VII.A.1.  The ALJ thus erred in rejecting Dr.

Connor's opinions on this basis.

### 2.    Reliance on Harris's Self-Reports

The ALJ's second reason for rejecting Dr. Connor's opinions also fails.  An ALJ

may justifiably discount a treatment provider's opinions if they "are based 'to a large

extent' on an applicant's self-reports and not on clinical evidence, and the ALJ finds the

applicant not credible."  *Ghanim*, 763 F.3d at 1162 (*Tommasetti v. Astrue*, 533 F.3d 1035,

1041 (9th Cir. 2008)).  "However, when an opinion is not more heavily based on a

patient's self-reports than on clinical observations, there is no evidentiary basis for

rejecting the opinion."  *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (citing

*Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008)); *see Edlund v.*

*Massanari*, 253 F.3d 1152, 1159 (9th Cir. 2001).

Here, Dr. Connor's opinion was based on much more than Harris's self-reports, as

Dr. Connor administered 15 different psychological tests, and conducted a long clinical

interview.  AR at 714.  Clinical interviews and psychological testing "are objective

measures and cannot be discounted as a 'self-report.'"  *Buck v. Berryhill*, 869 F.3d 1040,

1049 (9th Cir. 2017).  Furthermore, psychiatric evaluations "will always depend in part

on the patient's self-report" because "unlike a broken arm, a mind cannot be x-rayed."

*Id.* (internal quotation marks omitted) (quoting *Poulin v. Bowen*, 817 F.2d 865, 873 (D.C.

Cir. 1987)).  "Thus, the rule allowing an ALJ to reject opinions based on self-reports does

not apply in the same manner to opinions regarding mental illness." *Buck*, 869 F.3d at 1049. The ALJ therefore had no reasonable basis to reject Dr. Connor's opinion as too heavily based on Harris's self-reports.

### 3. Dr. Connor's Memory and Problem-Solving Issues Opinion

The ALJ's treatment of Dr. Connor's opinion that Harris may have greater memory and problem-solving issues outside the testing environment has some support, but still must be reversed. The ALJ is correct that Harris did not have memory issues on objective medical testing. *See* AR at 545, 718. But that misses the point of Dr. Connor's opinion. Dr. Connor's interpretation of his thorough examination and test results was that Harris's anxiety and impulse control problems, both of which were evident on objective testing, may impact Harris's functioning outside the testing environment. *See id.* at 720. Harris's performance on memory and problem-solving tests in the controlled clinical environment was tangential to this conclusion. The fact that the ALJ might have interpreted these test results differently is not a specific and legitimate reason to reject them. *See Lovell v. Colvin*, No. 13-cv-05757 JRC, 2014 WL 3362465, at *8 (W.D. Wash. July 9, 2014) (holding that the ALJ could not substitute her interpretation of test results for those of the doctor who obtained them); *see also Mkrtchyan v. Colvin*, No. C14-1209JLR, 2015 WL 2131222, at *6 (W.D. Wash. May 5, 2015) (stating that "[b]ecause ALJs are as a rule not doctors, 'courts have regularly warned ALJs not to attempt to interpret test results or other raw medical data'") (quoting *Worzalla v. Barnhart*, 311 F. Supp. 2d 782, 796 (E.D. Wis. 2004)).

The ALJ also erred in rejecting Dr. Connor's opinion on Harris's memory and problem-solving issues because they were too vague. The ALJ may reject a medical opinion when it is "too vague to be useful." *King v. Comm'r of Soc. Sec. Admin.*, 475 F. App'x 209, 210 (9th Cir. 2012). But Dr. Connor's opinion was very detailed, describing Harris's performance in six enumerated areas of functioning, and providing specific behavioral observations. While Dr. Connor summarized this portion of his opinion in more speculative terms, he stated with particularity the areas in which Harris struggled. *See* AR at 717-719. It was then the ALJ's responsibility to convert these medical determinations into specific work limitations based on the entirety of the record. *See Rounds v. Comm'r of Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015) ("[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC.") (citing *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008)). If he felt unable to do so, or needed clarification about Dr. Connor's opinions, then the ALJ could have contacted Dr. Connor for more information. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (holding that the ALJ "has an independent 'duty to fully and fairly develop the record to assure that the claimant's interests are considered'") (quoting *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)). The ALJ thus erred in rejecting Dr. Connor's opinion on Harris's memory and problem-solving difficulties in non-clinical settings.

### 4.      Harmful Error

The ALJ's rejection of Dr. Connor's opinions was harmful error. The Court has determined that the ALJ did not give specific and legitimate reasons for rejecting Dr.

Connor's opinions.  Had the ALJ correctly evaluated those opinions, he very well may have reached a different disability determination.  Accordingly, the ALJ's error must be considered harmful.

**C.    The ALJ Erred in Evaluating the Medical Opinions of Danielle Jenkins, Psy.D.**

Dr. Jenkins examined Harris on October 14, 2014.  AR at 782.  She reviewed several medical records, conducted a clinical interview, performed a mental status exam, and administered two psychological tests: the Beck Depression Inventory ("BDI") and Beck Anxiety Inventory ("BAI").  *Id.* at 782, 785-86.  Based on these efforts, Dr. Jenkins diagnosed Harris with bipolar disorder, anxiety disorder, cannabis dependence, attention deficit hyperactive disorder, and made a rule-out diagnosis of posttraumatic stress disorder.  *Id.* at 783.  She opined that Harris had severe limitations in his ability to learn new tasks, adapt to changes in a routine work setting, and complete a normal work day and week without interruptions from his psychologically-based symptoms.  *Id.* at 784.

The ALJ gave little weight to Dr. Jenkins's opinions because they were inconsistent with Harris's mental health treatment history, and based on Harris's self-reports, which the ALJ had rejected.  *Id.* at 25-26.  The ALJ gave the same justifications here as he did for rejecting Dr. Connor's opinions.  *See id.*  Just as those reasons were insufficient to support rejection of Dr. Connor's opinions, they are insufficient to support rejection of Dr. Jenkins's opinions.  *See supra* Part VII.B.1-2.  The ALJ thus erred in rejecting Dr. Jenkins's opinions.

The ALJ's rejection of Dr. Jenkins's opinions must be considered harmful error. As with his rejection of Dr. Connor's opinions, the ALJ may have reached a different disability determination if he had appropriately evaluated Dr. Jenkins's opinions, and thus the ALJ's error was harmful.

**D.    The ALJ Erred in Evaluating the Medical Opinions of Wayne Dees, Psy.D.**

Dr. Dees examined Harris on October 3, 2012.  AR at 550.  Dr. Dees reviewed several medical records, conducted a clinical interview, performed a mental status exam, and administered the BDI and BAI.  *Id.* at 550-58.  He diagnosed Harris with bipolar disorder, generalized anxiety disorder with panic and obsessive compulsive disorder symptoms, cognitive disorder, and cannabis dependence.  *Id.* at 552.  Dr. Dees concluded that Harris had severe limitations in his ability to adapt to changes in a routine work setting, communicate and perform effectively in a work setting, and complete a normal work day and week without interruptions from his psychologically-based symptoms.  *Id.* at 552-53.  He also concluded that Harris had marked limitations in his ability to perform activities within a regular schedule and maintain attendance without special supervision, maintain appropriate behavior in a work setting, and set realistic goals and plan independently.  *Id.*

The ALJ gave little weight to Dr. Dees's opinions.  *Id.* at 25-26.  Once again, the ALJ claimed that Dr. Dees's opinions were inconsistent with Harris's mental health treatment history, and based on Harris's self-reports, which the ALJ had rejected.  These reasons fail for the same reasons they failed as to Drs. Connor and Jenkins.  *See supra* Part VII.B.1-2.

The ALJ gave three additional reasons for discounting Dr. Dees's opinions: (1) Harris "was not honest in reporting his alcohol and marijuana use to Dr. Dees"; (2) Dr. Dees's opinions were based on review of a limited set of records; and (3) Dr. Dees's examination "was solely for the purpose of establishing eligibility for state benefits." *Id.* at 25-26, 197.

### 1. Harris's Misreporting of Alcohol and Marijuana Use

The ALJ's rejection of Dr. Dees's opinion because of Harris's misreporting of his alcohol and marijuana use finds some support in the record, but not enough to justify discounting Dr. Dees's opinions. With regard to alcohol use, the record does not reveal a clear inconsistency between Harris's reports to Dr. Dees and his reports elsewhere. Dr. Dees noted that Harris drinks "maybe once a month or so." AR at 551. As discussed above, Harris elsewhere reported drinking one to two times per month in this timeframe. *See id.* at 544, 567. This is not so significant a discrepancy as to provide a specific and legitimate reason for rejecting Dr. Dees's opinions.

Harris's reporting of his marijuana use contained more significant discrepancies. Harris told Dr. Dees he smoked marijuana one to two times per week. *Id.* at 551. Less than two weeks later, however, he reported to one of his providers that he was smoking three to four bowls of marijuana per day. *Id.* at 567. While this discrepancy is troubling, there is no indication that it impacted Dr. Dees's conclusions, nor did the ALJ provide any explanation on that point. Dr. Dees diagnosed Harris with cannabis dependence in spite of Harris's underreporting, but concluded that Harris's current impairments were not the result of his drug use. *Id.* at 553. The ALJ apparently agreed, as he found that

Harris suffered from marijuana dependence, but that condition had not had a "significant functional impact for any 12-month period." *Id.* at 16. The ALJ therefore did not provide a specific and legitimate reason for rejecting Dr. Dees's opinions by pointing out Harris's misreports of marijuana and alcohol use. *See Edlund*, 253 F.3d at 1159.

### 2. Limited Scope of Records Reviewed

The ALJ was also not justified in discounting Dr. Dees's opinions because they were based on a limited number of records. The ALJ does not point to any records that Dr. Dees did not review that might cause him to change his opinions, so this point is largely irrelevant. Moreover, Dr. Dees actually examined Harris, and the Social Security Administration's ("SSA") own regulations place more weight on opinions from doctors who examine claimants than those who simply review medical records. *See* 20 C.F.R. § 404.1527(c)(1); *see also Lester*, 81 F.3d at 830-31 (noting that "[t]he opinion of an examining physician is . . . entitled to greater weight than the opinion of a nonexamining physician"). This was thus not a specific and legitimate reason for discounting Dr. Dees.

### 3. Examination for the Purpose of Obtaining State Benefits

The ALJ's final reason for rejecting Dr. Dees's opinions, that his examination was performed for the purpose of obtaining state benefits, hardly warrants discussion. Examining doctors regularly see claimants solely for the purpose of determining whether they are eligible for benefits, and often do so at the request of the SSA. *See, e.g.*, POMS, DI 22510.001, *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0422510001. This has no bearing on the accuracy of the doctors' opinions, and is certainly not a specific and legitimate reason to reject those opinions.

**4.      Harmful Error**

Once again, the Court must conclude that the ALJ's rejection of Dr. Dees's opinion was harmful error. Had the ALJ properly evaluated Dr. Dees's opinions, he may have formulated a different residual functional capacity ("RFC"), and reached a different disability determination. The ALJ thus harmfully erred here.

**E.      The ALJ Erred in Evaluating the Medical Opinions of Andrew Forsyth, Ph.D. and Steven Haney, M.D.**

Dr. Forsyth and Dr. Haney are consulting doctors who reviewed Harris's medical records as part of his disability determination at the initial and reconsideration levels. *See* AR at 124-28, 137-41, 156-57, 160-62, 173-74, 177-79. Each concluded, among other things, that Harris "would need to be in settings with minimal interpersonal contacts as this would be significantly less stressful for him." *Id.* at 127, 140, 162, 179.

The ALJ gave "significant weight" to Dr. Forsyth and Dr. Haney's opinions, although he claimed to assess "more specific social limitations" than either doctor. *Id.* at 24. In the RFC, the ALJ limited Harris to "occasional and superficial interaction with the public and with coworkers." *Id.* at 18.

Harris argues that the ALJ erred because he did not apply any social limitations on Harris's interaction with supervisors. In his prior opinion, the ALJ addressed this issue, stating that the social interaction opinions from Dr. Forsyth and Dr. Haney "appear[] to apply to supervisors" as well as the public and coworkers. *Id.* at 196. However, the ALJ rejected this further limitation because Harris "has not demonstrated difficulties with any providers or others during the relevant period." *Id.*

The Court has little choice but to find error here.  The ALJ rightly concluded in his original decision that Dr. Forsyth and Dr. Haney's social limitations would apply to supervisors.  He entirely ignored that part of their opinions in his current decision, and thus essentially rejected it without giving any reasons for doing so.  This was error.  *See Dennis v. Colvin*, No. 06:14-cv-00822-HZ, 2015 WL 3867506, at *8 (D. Or. June 20, 2015) (holding that when an ALJ gives great weight to a medical source's opinion, he errs if he fails to account for that opinion in the RFC); *see also Valentine*, 574 F.3d at 690 (holding that an ALJ must account for all of the claimant's medically supportable limitations when crafting the RFC).

Even if the Court were to consider the ALJ's original reasons for omitting supervisors from the social limitation in the RFC, the Court would still find error.  The record contradicts the ALJ's statement that Harris had no trouble interacting with his medical providers.  In April 2016, Harris's provider had to spend the majority of an appointment that was supposed to be for back pain dealing with Harris being irate and rude.  AR at 1404-05.   In October 2014, another provider noted that Harris used obscene language and had a threatening demeanor.  *Id.* at 1442.  Dr. McDuffee also noted that Harris had a problem complying with his treatment because of a "persecutory ideation." *Id.* at 545.  The ALJ thus erred in failing to properly address the opinions of Dr. Forsyth and Dr. Haney as they apply to Harris's interaction with supervisors.

Because this error meant that the ALJ failed to address a possible work limitation, it was harmful error.  The Court cannot confidently conclude that the ALJ would have

reached the same result regardless of his mistreatment of Dr. Forsyth and Dr. Haney's opinion, and therefore the ALJ committed harmful error.

**F.      Scope of Remand**

Harris asks the Court to remand this matter for payment of benefits.  Op. Br. at 18. The Court may remand for an award of benefits when "the record has been fully developed and further administrative proceedings would serve no useful purpose." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen*, 80 F.3d at 1290).  But remand for an award of benefits "is a rare and prophylactic exception to the well-established ordinary remand rule." *Leon v. Berryhill*, 880 F.3d 1041, 1044 (9th Cir. 2017).  Thus, to remand for an award of benefits, the Court must determine that: "(1) the ALJ has failed to provide legally sufficient reasons for rejecting the claimant's evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled if he considered the claimant's evidence." *McCartey*, 298 F.3d at 1076-77 (citing *Smolen*, 80 F.3d at 1292).

These three conditions are not all met here, and thus the Court must remand for further proceedings.  While the ALJ harmfully erred, the Court is unable to conclude that the ALJ would be required to find Harris disabled if he had properly considered the evidence in the record.  The Court is not in a position to translate Harris's testimony and the medical evidence into an RFC, nor is it in a position to determine whether Harris could perform his past work or other jobs available in significant numbers in the national economy.  Further proceedings are necessary to address these issues.

On remand, the ALJ should reevaluate Harris's mental health symptom testimony, as well as the opinions of Dr. Connor, Dr. Jenkins, Dr. Dees, Dr. Forsyth, and Dr. Haney, and conduct further proceedings as necessary to determine Harris's disability status.

## VIII.    ORDER

Therefore, it is hereby **ORDERED** that the Commissioner's final decision denying supplemental security income benefits is **REVERSED** and this case is **REMANDED** for further administrative proceedings under sentence four of 42 U.S.C. § 405(g).

Dated this 9th day of July, 2018.

BENJAMIN H. SETTLE
United States District Judge